UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUSTIN G. LUBBERS,

      Plaintiff(s),                           Civil Action No. 14-cv-13459

vs.                                         HON. BERNARD A. FRIEDMAN

FLAGSTAR BANCORP. INC.,
ALESSANDRO P. DINELLO, and
PAUL D. BORJA,

      Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

This matter is presently before the Court on defendants' Motion to Dismiss Plaintiff's Amended Complaint [docket entry 19]. Plaintiff has filed a response in opposition and defendants have filed a reply. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing. For the following reasons, the Court shall grant defendants' motion to dismiss.

**I. Background**

Plaintiff brings this federal securities class action against Flagstar Bancorp., Inc. ("Flagstar") and two of its officers, Alessandro P. DiNello, Chief Executive Officer, and Paul D. Borja, former Chief Financial Officer and current Senior Deputy General Counsel on behalf of all persons and entities that purchased shares of Flagstar common stock during the period from October 22, 2013, to August 26, 2014 ("the class period"). Plaintiff alleges that during the class period, Flagstar omitted material information and included misleading statements in its public disclosures in violation of § 10(b) of the Securities and Exchange Act of 1934 ("Securities Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission

("SEC").  Further, plaintiff asserts that defendants DiNello and Borja, as controlling persons of Flagstar, are liable under § 20(a) of the Securities Act for Flagstar's § 10(b) and Rule 10b-5 violations.

Flagstar is the holding company for non-party Flagstar Bank, which, among other activities, originates, acquires, sells, and services mortgage loans.  Plaintiff alleges that after the collapse of the mortgage industry in 2008, Flagstar began to cut corners and violate various consumer protection laws.  Am. Compl. ¶ 27.  Plaintiff claims that in 2011, with mortgage origination declining and mitigation and default servicing rising, Flagstar was forced to reduce its non-interest expenses to boost retained earnings and meet the Federal Reserve's stress tests.  *Id.* ¶ 33.  One way Flagstar allegedly kept expenses low was by reducing personnel and investment in technology systems.  *Id.* ¶ 34.  As a result, Flagstar allegedly experienced a backlog in processing loan modification and loss mitigation applications, such that in September 2011 Fannie Mae threatened to terminate Flagstar's servicing rights on loans owned or guaranteed by Fannie Mae.  *Id.* ¶¶ 34-35.  Plaintiff alleges that this reduction in personnel caused Flagstar to cut corners and violate federal consumer protection laws and regulations, which caused the Consumer Financial Protection Bureau ("CFPB") to investigate Flagstar's mortgage-related practices.  *Id.* ¶ 3.[1]

On August 26, 2014, Flagstar filed a Form 8-K with the SEC that disclosed it had commenced discussions with the CFPB regarding a potential settlement relating to "alleged violations of various federal consumer financial laws arising from the Bank's loss mitigation

---

[1]  In support of plaintiff's allegations, the complaint includes statements from nine confidential witnesses who were former Flagstar employees with "first-hand knowledge of loan modification, loss mitigation and default servicing throughout the relevant period, both prior to and during the Class Period."  *Id.* ¶ 38; *see generally id.* ¶¶ 38-87.

practices and default servicing operations dating back to 2011." *Id.* ¶ 120.  In that disclosure, Flagstar stated that "[w]hile the Bank intends to vigorously defend against any enforcement action that may be brought, it has commenced discussions with the CFPB staff to determine if a settlement can be achieved." *Id.*  In response to this disclosure, Mark Palmer, an analyst at BTIG, LLC, downgraded Flagstar's rating and noted that the "allegations raise questions regarding servicing operations amid uncertainty of potential rebound of its mortgage business." *Id.* ¶ 121.  On August 27, 2014, Flagstar's stock fell $0.83 per share and closed at $17.66.  *Id.* ¶ 122.   With the market speculating that " a material settlement may be imminent" because "[Flagstar] felt it was necessary to mention the company was in discussion with the CFPB," Flagstar's stock price continued to decline and closed at $17.33 per share on August 28, 2014.  *Id.* ¶¶ 123-24.

A month later, on September 29, 2014, the CFPB filed a Consent Order in an administrative proceeding captioned, *In the Matter of: Flagstar Bank, FSB*, File No. 2014-CFPB-0014, wherein the CFPB stated that Flagstar had violated §§ 1036(a)(1)(B) and 1031(C)(1) of the Consumer Financial Protection Act ("CFPA") by (1) failing to review loss mitigation applications in a reasonable amount of time from at least 2011 to September 2013, *id.* ¶¶ 88-89; (2) withholding information that borrowers needed in order to complete their loss mitigation applications for at least a nine-month period from 2012 to 2013, *id.* ¶ 90; (3) denying loan modifications to qualified borrowers by regularly miscalculating borrower income, *id.* ¶ 91; and (4) improperly prolonging borrowers' trial period plans for loan modifications, *id.* ¶ 92.  The CFPB also found that Flagstar violated various loss mitigation procedures and general servicing policies.  *Id.* ¶ 93.  Pursuant to the stipulation, Flagstar did not admit or deny any of the findings of fact or conclusions of law, except those facts necessary to establish the CFPB's jurisdiction over Flagstar and the subject matter of the

action. *Id.* ¶ 88.

On September 5, 2014, about a month before the CFPB filed the Consent Order, this federal securities class action was filed. On February 3, 2015, plaintiff Rodney Boone, who purchased shares of Flagstar's common stock during the class period, filed an amended complaint. *Id.* ¶ 18. Plaintiff alleges that he and others similarly situated suffered an investment loss because Flagstar withheld material information from investors. *Id.* ¶ 13. Specifically, plaintiff alleges that Flagstar's public disclosures during the putative class period were misleading because they failed to inform investors that the CFPB was investigating Flagstar. *See id.* ¶ 96. Plaintiff also alleges that "[t]he threat of termination by Fannie Mae and Freddie Mac in 2011 and the risk of violations evidenced in the audit by CFPB during the Class Period were known material events" that should have been disclosed and that Flagstar "further materially misled investors by touting the efficiency of their loss mitigation and default servicing practices in periodic filings with the SEC." *Id.* ¶ 95. Finally, plaintiff alleges that Flagstar misled investors when it sold its non-performing and defaulted loans to Matrix Financial Services Corporation ("Matrix Financial"), but did not disclose to investors that this sale did not absolve Flagstar of its liabilities relating to alleged violations of consumer protection laws dating from 2011. *Id.* ¶¶ 98, 101.

Count I of the amended complaint asserts a violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all defendants. Count II asserts a violation of § 20(a) of the Securities Act against DiNello and Borja. Defendants move for dismissal of all claims.

## II.  Legal Standards

### A.  Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). In deciding a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff and accept all of the complaint's factual allegations as true." *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001).

## B.  Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act

In addition to meeting the general pleading requirements of Fed. R. Civ. P. 12(b)(6), "[a]llegations of securities fraud must, as must allegations of fraud generally, satisfy the requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *In re Comshare Inc. Secs. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To satisfy Rule 9(b), "the plaintiff[], at a minimum, 'must allege the time, place, and content of the alleged misrepresentation . . . ; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (citing *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)).

5

Allegations of securities fraud must also meet the heightened pleading standard of the Private Securities Litigation Reform Act ("PSLRA"). The PSLRA was enacted to "curb perceived abuses of the § 10(b) private action–'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007) (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006)). To this end, the PSLRA imposes additional pleading burdens in securities fraud cases, including that the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Additionally, scienter must be pled with particularity. *See id.* § 78u-4(b)(2). These requirements are purposefully demanding and have been described as "exacting," *Tellabs*, 551 U.S. at 313, and as an "elephant-sized boulder blocking [a plaintiff's securities] suit," *In re Omnicare, Inc. Secs. Litig.*, 769 F.3d 455, 461 (6th Cir. 2014).

## C. Securities and Exchange Act Claims: § 10(b) and Rule 10b-5

"Section 10(b) of the Securities Exchange Act . . . and Rule 10b-5 'prohibit fraudulent, material misstatements or omissions in connection with the sale or purchase of a security.'" *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008) (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 680-81 (6th Cir. 2004)). Section 10(b) provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange–

6

***

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5, promulgated by the SEC under § 10(b) provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c)To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  In order to state a claim under § 10(b) and Rule 10b-5, a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

## III.  Analysis

### A.  Duty to Disclose Material Information

Plaintiff alleges that Flagstar's public filings during the class period were misleading because they failed to disclose that (1) the CFPB was investigating Flagstar for violations of the

CFPA; (2) Fannie Mae had threatened to terminate Flagstar's rights to loan servicing as early as 2011; (3) any reduction in headcount was driven by a failure to comply with consumer protection regulations; and (4) Flagstar's sale of loan servicing rights to Matrix Financial in December 2013 did not diminish Flagstar's liability for violations of the CFPA dating from 2011.

"Before liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure." *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997). An affirmative duty of disclosure arises if "(1) created by SEC statute or rule; (2) there is insider trading; or (3) there was a prior statement of material fact that is false, inaccurate, incomplete or misleading in light of the undisclosed information." *In re Ford Motor Co., Secs. Litig.*, 184 F. Supp. 2d 626, 631-32 (E.D. Mich. 2001). Plaintiff argues that Flagstar's affirmative duty to disclose arises from this third category.

"[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know the fact." *In re Time Warner, Inc., Secs. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). However, when a corporation makes a "voluntary disclosure," it must speak "fully and truthfully." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 564 (6th Cir. 2001). A corporation must "provide complete and non-misleading information with respect to subjects on which [it] undertakes to speak." *Id.* at 561. In other words, "a company may choose silence or speech elaborated by the factual basis as then known–but it may not choose half-truths." *Id.* The Sixth Circuit has explained that the duty to speak "fully and truthfully" comes from Rule 10b-5:

> The question . . . is not whether [a defendant's] silence can give rise to liability, but whether liability may flow from his decision to speak . . . concerning material details . . . without revealing certain additional known facts necessary to make his statements not misleading. This question is answered by the text of Rule 10b-5(b) itself: it is unlawful for any person to 'omit to state a material fact

> necessary in order to make the statements made, in the light of the
> circumstances under which they were made, not misleading[.]

*Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998) (quoting 17 C.F.R. §

240.10b-5(b)) (overruled on other grounds).

In securities fraud cases, "materiality depends on the significance the reasonable

investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485

U.S. 224, 240 (1988). "Materiality can be established by proof of a 'substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor as having

significantly altered the 'total mix' of information made available.'" *Ind. State Dist. Council of*

*Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 943 (6th Cir.

2009) (quoting *Zaluski*, 527 F.3d at 571).

Courts must look to the context in which statements are made to determine whether

an omission renders prior statements misleading. *See The MJK Family LLC v. Corp. Eagle Mgt.*

*Servs., Inc.*, No. 09-12613, 2009 WL 4506418, at *7 (E.D. Mich. Nov. 30, 2009). When examining

context, "[s]ome statements, although literally accurate, can become, through their context and

manner of presentation, devices which mislead investors." *McMahan & Co. v. Wherehouse Entm't,*

*Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). A material misrepresentation is therefore "measured not by

literal truth, but by the ability of the material to accurately inform rather than mislead prospective

buyers." *Id.* "Thus, a court must not 'pluck' disclosures out of their context and analyze their truth

in a vacuum, but must look at the statements made in light of the circumstances and events that

create the context in which they were made." *MJK Family LLC*, 2009 WL 4506418, at *7 (citing

*City of Monroe v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005)). With these standards in

mind, the Court will now turn to each of the allegedly misleading disclosures cited by plaintiff.

9

**i. Disclosures Relating to Ongoing Regulatory Investigations**

Plaintiff asserts that the following paragraph found in three Form 10-Qs that Flagstar filed with the SEC on October 30, 2013, May 9, 2014, and July 29, 2014, was misleading:

> From time to time, governmental agencies conduct investigations or examinations of various mortgage related practices of the Bank. Ongoing investigations relate to whether the Bank has properly complied with laws or regulations relating to mortgage origination or mortgage servicing practices and to whether its practices with regard to servicing residential first mortgage loans are adequate. The Bank is cooperating with such agencies and providing information as requested. In addition, the Bank has routinely been named in civil actions throughout the country by borrowers and former borrowers relating to the origination, purchase, sale and servicing of mortgage loans.

Am. Compl. ¶¶ 99, 114, 118.

Plaintiff argues that the introductory phrase "[f]rom time to time" gave the false impression that investigations into Flagstar's mortgage-related practices were routine, when in fact Flagstar's violations of consumer protection laws spurred the CFPB's investigations. *Id.* ¶¶ 100, 115, 119. Plaintiff also argues that references to "ongoing investigations" were misleading because Flagstar should have disclosed that the CFPB was specifically targeting Flagstar for CFPA violations. *Id.* Further, plaintiff asserts that the above-cited paragraph is "materially misleading because [it] fail[s] to disclose that Fannie Mae had threatened to terminate Flagstar's rights to loan servicing as early as 2011[.]" *Id.* Finally, plaintiff argues that "to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." Pl.'s Resp. at 23 (quoting *In re Van der Moolen Holding N.V. Secs. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005)).

Flagstar argues that because it disclosed its involvement with ongoing investigations,

"no reasonable investor could have read Flagstar's disclosures as negating the possibility of a CFPB investigation or settlement." Defs.' Mot. at 13. In support, Flagstar points to the court's statement in *In re Bank of America*, that "where there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk." *Id.* at 12 (quoting *In re Bank of Am. AIG Disclosure Secs. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013)). Flagstar also cites *Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999), where the court stated that "when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Id.* at 807.

The Court agrees with Flagstar and finds that even when considering the undisclosed information, the above-cited paragraph is not misleading. First, the Court finds that plaintiff's argument regarding the misleading nature of the phrase "from time to time" to be nothing more than a non-actionable, semantic quibbling. *See Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 612 (6th Cir. 2005) (rejecting plaintiffs' 10b-5 argument as a "semantic quibble"). In *Benzon*, plaintiffs argued that an investment prospectus was misleading for disclosing that brokers *may* receive different compensation for selling certain share classes when in actuality brokers *did* earn more under the existing pay structure. *Id.* The court of appeals dismissed plaintiffs' claim as a "semantic quibble" and found that, if anything, defendant's disclosure put "prospective investors on notice that *there was a possibility* that brokers were being compensated more highly for the sale of certain class shares than others, such that investors could pursue that line of inquiry with their financial advisors if they were concerned about broker incentives." *Id.* (emphasis added).

The same is true of Flagstar's disclosure. Even assuming the phrase "from time to

11

time" may have conveyed the impression that investigations were routine, the disclosure was broad enough to encompass the possibility that the CFPB was investigating Flagstar for not complying with consumer protection laws.  The paragraph found in the three Form 10-Qs stated that (1) Flagstar was subject to governmental agency investigations; (2) there were *ongoing* investigations into whether Flagstar had properly complied with laws and regulations relating to mortgage servicing and origination; and (3) Flagstar was *presently* cooperating with such agencies.  *See* Am. Compl. ¶¶ 99, 114, 118.  Although plaintiff would have liked to know that the CFPB was specifically investigating Flagstar for violations of consumer protection laws and regulations, Flagstar was under no duty to disclose this information to make the paragraph in the Form 10-Qs not misleading.  In other words, a reasonable investor would not have viewed the omitted fact (the CFPB's active investigation) as *significantly* altering the "total mix" of information available.  *See Zaluski*, 527 F.3d at 571.  Flagstar's disclosure was broad enough to put investors on notice of the possibility that a governmental agency, like the CFPB, was investigating Flagstar's practices.

The Court also rejects plaintiff's catch-all argument that the above-cited paragraph is misleading because it fails to disclose that Fannie Mae had threatened to terminate Flagstar's rights to loan servicing as early as 2011.  "To constitute an omission there must be a relationship between the omission and the statement itself, because it would be untenable not to have limits on the scopes of subjects." *Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*, 22 F. Supp. 3d 669, 679 (E.D. Ky. 2014).  There is no relationship between the alleged material omission of *past* Fannie Mae threats and Flagstar's disclosure regarding *ongoing* investigations by governmental agencies.  Because there is no relationship, it was not necessary for Flagstar to disclose these alleged Fannie Mae threats "in order to make the statements made, in light of the circumstances under which they

were made, not misleading."  17 C.F.R. § 240.10b-5.

Plaintiff next asserts that the following statements in a Form 10-K that Flagstar filed

with the SEC on March 5, 2014, were misleading:

> ***Expanded regulatory oversight over our business could
> significantly increase our risks and costs associated with complying
> with current and future regulations, which could adversely affect
> our financial condition and results of operations.***
>
> As a result of increasing scrutiny and regulation of the
> banking industry and consumer practices, <u>we may face a greater
> number or wider scope of investigations</u>, enforcement actions and
> litigation, thereby increasing our costs associated with responding
> to or defending such actions.
>
> ***
>
> ***The CFPB may reshape the consumer financial laws through
> rulemaking and enforcement.  Compliance with any such changes
> may impact our operations.***
>
> The CFPB has broad and unique rulemaking authority to
> administer and carry out the provisions of the Dodd-Frank Act with
> respect to financial institutions that offer covered financial products
> and services to consumers, including prohibitions against unfair,
> deceptive or abusive practices in connection with any transaction
> with a consumer for a consumer financial product or service, or the
> offering of a consumer financial product or service.  <u>The concept of
> what may be considered to be an "abusive" practice is new under the
> law</u>.  Moreover, the Bank will be supervised and examined by the
> CFPB for compliance with the CFPB's regulations and policies.
> While the full scope of the CFPB's rulemaking and regulatory agenda
> relating to the mortgage industry remains unclear, it has already been
> active in issuing guidelines, rules and regulations affecting our
> business, and it has also been active in enforcing consumer financial
> protection laws against mortgage originators and servicers.
>
> ***
>
> ***We may incur fines, penalties and other negative consequences
> from regulatory violations, possibly even for inadvertent or
> unintentional violations.***
>
> We maintain systems and procedures designed to ensure that

13

> we comply with applicable laws and regulations. However, some
> legal and regulatory frameworks provide for the imposition of fines
> or penalties for noncompliance even though the noncompliance was
> inadvertent or unintentional and even though there was in place at the
> time systems and procedures designed to ensure compliance.

*Id.* ¶¶ 106, 108, 110 (boldface, italics, and underlining in original).

Plaintiff argues that the statement "we may face a greater number or wider scope of investigations" was misleading because it "gave the false representation that any investigation or oversight would be in the future, when in fact Flagstar had been investigated since as early as 2011 by Fannie Mae and Freddie Mac[.]" *Id.* ¶ 107. This argument fails because plaintiff is again quibbling with semantics. No reasonable investor could interpret this statement as negating the possibility that investigations were currently underway. Just because Flagstar was exposed to the possibility of a *greater* number of investigations does not mean that Flagstar was not currently subject to *any* investigations. The Court also rejects plaintiff's argument that this statement was misleading because it did not mention threats from Fannie Mae and Freddie Mac. Because there is no relationship between the alleged material omission (*past* Fannie Mae and Freddie Mac threats) and the disclosure itself (that Flagstar may face a greater number of investigations in the *future*), no disclosure was necessary.

The same analysis applies to Flagstar's statement "what may be considered an 'abusive' practice is new under the law." Plaintiff argues this statement was "belied by the investigation by Fannie Mae in 2011 and the Letter received by the Company from Fannie Mae which specifically listed practices that were abusive violations of consumer protection laws." Am. Compl. ¶ 109. Again, there is no relationship between a 2011 alleged Fannie Mae letter and a generic statement informing investors that consumer protection laws and regulations are ever

14

changing such that what is considered "abusive" under the law is new. As such, no disclosure was necessary.

Finally, the Court rejects plaintiff's argument that the statement "some legal and regulatory frameworks provide for the imposition of fines or penalties for noncompliance even though the noncompliance was inadvertent or unintentional and even though there was in place at the time systems and procedures designed to ensure compliance" was false because "Fannie Mae had exposed Flagstar violations that were neither inadvertent nor unintentional." *Id.* ¶ 111. This boilerplate statement regarding fines and penalties for noncompliance is too generic to be misleading. Moreover, disclosure was not necessary because the alleged material omission (that Fannie Mae had identified intentional violations in the past) has no relationship to the disclosure itself (that there can be liability for unintentional and inadvertent noncompliance).

## ii.  Disclosures Relating to Non-Interest Expense Reductions

Plaintiff also asserts that the following public disclosures by Flagstar were misleading:  (1) a Form 8-K filed with the SEC on October 22, 2013, that included a press release emphasizing that "non-interest expense decreased by $16 million during the quarter" and that "compensation and benefits decreased . . . . driven by . . . a decrease in both headcount and contract employees[,]" *id.* ¶ 97; (2) four Form 10-Qs filed with the SEC on October 30, 2013, May 9, 2014, July 22, 2014, and July 29, 2014, that described decreases in non-interest expenses, *id.* ¶¶ 99, 114, 116, 118; (3) a Form 8-K filed with the SEC on January 22, 2014, that included a press release emphasizing "workplace reductions" and "reduced operating costs," *id.* ¶ 103; and (4) a Form 8-K filed with the SEC on April 22, 2014, that included a press release where DiNello stated "cost reductions" were achieved by "enhancing efficiency across the organization[, which] led to a

15

reduction of noninterest expense as we completed the previously announced workforce reduction," *id.* ¶ 112.

Plaintiff argues that these statements were misleading because they gave the false impression that cost reductions were the result of business efficiency when they were in fact due to Flagstar's "failure to comply with consumer protection regulations that had caused Fannie Mae to threaten to terminate Flagstar's rights to loan servicing as early as 2011." *Id.* ¶¶ 98,104, 113, 117. Flagstar argues that it was not required to disclose that its "loss mitigation practices and default servicing operations were not in compliance with federal financial consumer protection laws[,]" *id.* ¶¶ 6, 98, 102, 104, 111, 113, 117, because "disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." Defs.' Mot. at 14 (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)). Flagstar also argues that because it "accurately reported the objective fact of workforce and cost reductions, the Company was not required to editorialize on all the possible reasons for why the reductions occurred." Defs.' Reply at 5.

Various courts have analyzed omission liability under analogous circumstances. In *Miller v. Champion Enters., Inc.*, 346 F.3d 660 (6th Cir. 2003), plaintiff argued that a press release announcing defendant's quarterly earnings, which plaintiff conceded were technically accurate, was misleading in light of the fact that defendant's largest distributor was in danger of bankruptcy. The court of appeals rejected plaintiff's argument that this disclosure constituted a "half-truth," noting:

> Just because defendants issued a press release . . . does not mean that they chose to speak on *any situation that could possibly affect their financial condition.* Such a rule would require almost unlimited disclosure on any conceivable topic related to an issuer's financial condition whenever an issuer released any kind of financial data.

*Id.* at 682 (emphasis added).  Similarly, in *In re Ford Motor Co. Secs. Litig.*, 381 F.3d 563 (6th Cir.

2004), plaintiffs argued that Ford's financial statements, while technically accurate, were misleading

"because Ford knew that such profits and sales were due to its sale of a defective product and that

the eventual public revelation of the defect would affect adversely Ford's financial status."  *Id.* at

570.  In rejecting plaintiffs' argument, the court of appeals noted that "[b]ecause plaintiffs have not

alleged the historical inaccuracy of Ford's financial and earnings' statements, such statements are

not misrepresentations."  *Id.*

       Likewise, in *Galati v. Commerce Bancorp., Inc.*, No. 04-3253, 2005 WL 3797764

(D.N.J. Nov. 7, 2005), plaintiffs argued that Commerce Bank's disclosures touting positive growth

in deposits were misleading in light of underlying criminal activity, which likely contributed to that

growth.  In finding that plaintiffs had failed to specify any material omission, the court reasoned that

"as long as they are accurate, earnings statements themselves do not create liability under Rule 10b-

5" and "[t]o hold otherwise would be to establish per se liability under Rule 10b-5 for any material

information related to corporate earnings releases–a result that would be almost indistinguishable

from creating a general duty of disclosure."  *Id.* at *7.

       The disclosures before the Court regarding headcount must be analyzed similarly to

those in *Miller*, *In re Ford*, and *Galati*.  Like the plaintiffs in those cases, the plaintiff in the present

case does not contest the technical accuracy of Flagstar's statements regarding reduction in

headcount and non-interest expenses.  Instead, plaintiff seeks to impose liability on Flagstar for not

explaining the underlying circumstances necessitating these reductions.  But there could be any

number of reasons why a corporation would reduce headcount and non-interest expenses, and to

require Flagstar to disclose all underlying circumstances would impose a general duty of unlimited

17

disclosure whenever any kind of financial data is released.  Because such a standard is not the law, Flagstar was not required to disclose the alleged Fannie Mae threats.

### iii.  Disclosures Relating to Flagstar's Sale of Mortgage Servicing Rights

Lastly, plaintiff asserts that a press release associated with a Form 8-K that Flagstar filed with the SEC on December 18, 2013, was misleading.  Am. Compl. ¶¶ 101-02.  This press release notified the public that Flagstar had entered into an "agreement to sell a substantial portion of its mortgage servicing rights ("MSRs") portfolio to Matrix Financial Services Corporation" and that "[a] central component of this transaction is that Flagstar will act as the sub-servicer on all of the mortgage loans underlying the MSRs being sold under the agreement."  *See* Defs.' Mot., Ex. Q, Pg ID 397.  Plaintiff argues this press release was misleading because it failed to disclose that the sale of servicing rights "did not end Flagstar Bank's liability for violations of the CFPA[.]"  Am. Compl. ¶ 102.  Plaintiff also argues that this statement was misleading because Flagstar should have disclosed that "the sale was prompted by the threats of Fannie Mae and Ginne [sic] Mae to terminate the Bank's loan servicing agreements."  Pl.'s Resp. at 18 (citing Am. Compl. ¶ 101).

Flagstar argues it was under no duty to "editorialize" material objective facts in any particular way, especially considering that Flagstar "*made no representations about whether the sale of MSRs to Matrix would impact the Bank's liability for servicing of loans that occurred prior to the sale*[.]"  Defs.' Mot. at 19-20 (emphasis in original) (citing *In re CRM Holdings, Ltd. Secs. Litig.*, No. 10 Civ. 975, 2012 WL 1646888, at *27 (S.D.N.Y. May 19, 2012)).  The Court agrees.  An omission need only be disclosed when necessary to make a previous statement not misleading.  *See* 17 C.F.R. § 240.10b-5(b).  No reasonable investor could have interpreted Flagstar's statement as suggesting that the sale of MSRs to Matrix Financial absolved Flagstar of any liability for previous

18

violations of the CFPA.  Because Flagstar made no representations regarding Matrix Financial's impact on Flagstar's liability for prior violations, the disclosure was not misleading.

Nor was Flagstar required to disclose that the sale of servicing rights was prompted by threats from Fannie Mae and Ginnie Mae.  There is no relationship between the alleged omission (Fannie and Ginnie Mae threats) and the disclosure itself (sale of MSR rights).  Even if it were true that Flagstar sold its servicing rights because of Fannie Mae and Ginnie Mae threats, Flagstar would still be under no obligation to disclose this information to make the announcement about Matrix Financial not misleading.  To hold otherwise would impose a general duty of unlimited disclosure, requiring a company to list all reasons necessitating its business decisions.  Because such a standard is not the law, Flagstar was not required to disclose the alleged Fannie Mae and Ginnie Mae threats.

**IV.  Conclusion**

For the aforementioned reasons, the Court concludes that plaintiff has failed to meet his burden in pleading an actionable, material omission.  Because plaintiff cannot satisfy the first element of his § 10(b) and Rule 10b-5 claim, Count I of the amended complaint must be dismissed and a discussion regarding the remaining elements of the § 10(b) claim is unnecessary.  Further, because plaintiff has failed to plead an actionable and material underlying omission to serve as the predicate for § 20(a) liability, Count II against the individual defendants Borja and DiNello must also be dismissed.  *See PR Diamonds*, 91 F. App'x at 442-43.  Accordingly,

IT IS ORDERED that defendants' motion to dismiss plaintiff's amended complaint

[docket entry 19] is granted.

S/Bernard A. Friedman_____
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE

Dated: February 10, 2016
      Detroit, Michigan

20